**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **The Melohn Companies, Inc.,** ) | **CASE NO. 1:17 CV 1303** |
| ) | |
| **Plaintiff,** ) | **JUDGE PATRICIA A. GAUGHAN** |
| ) | |
| vs. ) | |
| ) | |
| **AmeriFirst Financial Corporation,** ) | **Memorandum of Opinion and Order** |
| ) | |
| **Defendant.** ) | |

## INTRODUCTION

This matter is before the Court upon Defendant AmeriFirst Financial Corporation's Motion for Summary Judgment (Doc. 20), Plaintiff The Melohn Companies, Inc.'s Motion for Partial Summary Judgment (Doc. 22), and Defendant AmeriFirst Financial Corporation's Motion for Leave to File Sur-Reply (Doc. 30). Plaintiff The Melohn Companies, Inc. ("Melohn") brings a state law claim of tortious interference with contract against Defendant AmeriFirst Financial Corporation ("AmeriFirst"). This Court has diversity jurisdiction over this case. For the following reasons, AmeriFirst's motion for summary judgment is GRANTED, and Melohn's motion for partial summary judgment is DENIED. AmeriFirst's motion to file a sur-reply brief is

GRANTED because Melohn raised new issues for the first time in its reply brief in support of its motion for partial summary judgment.

**FACTS**

On May 18, 2014, Donald M. Horner, Jr. ("Horner") purchased residential real property located in Shaker Heights, Ohio, from Fannie Mae. The purchase agreement noted that Horner intended to secure a Department of Housing and Urban Development ("HUD") 203K renovation loan for the property. (Doc. 20-2, at Page ID 480). A HUD 203K loan, which is guaranteed by the Federal Housing Administration ("FHA"), allows a buyer to finance both the acquisition of a residential property and home improvements. Horner applied for a 203K loan from AmeriFirst, which is an approved FHA lender, and was awarded the loan.

The PowerSaver Grant

On July 10, 2014, Melohn submitted a Bid on Repairs to perform the repairs on Horner's house. After Melohn submitted the original bid, Horner decided to apply for a HUD PowerSaver grant, which permits an award for borrowers who commit to making eligible energy efficiency upgrades to the residence. (Steven Harvey Aff. ¶¶ 7-8). On July 16, 2014, Horner emailed HUD's property inspection consultant Steven Harvey and Melohn to inform them that he intended to seek the grant. The same day, Taella Berman of AmeriFirst also emailed Melohn to explain that Horner was seeking a PowerSaver grant. She asked Melohn to "update [its] estimate by adding a materials list showing ...the make, model, [and] serial number of" of the products that it intended to install so that she could verify that they were Energy Star compliant. Attached to her email was the eligibility checklist for the grant, showing that heating systems and water heaters had to be Energy Star compliant to qualify for the grant. (Doc. 28-2, at Page ID 1529-

2

1535).

On July 18, 2014, Harvey prepared a revised Bid on Repairs to account for the fact that Horner was seeking a PowerSaver grant from HUD. He emailed Melohn a copy of the revised Bid on Repairs, which acknowledged that the project was subject to a HUD 203K loan and provided that Melohn would furnish and install a new Energy Star-compliant hot water heater and replace the existing HVAC system with a new Energy Star-compliant system. (Harvey Aff. ¶¶ 10-12).[1] The Bid on Repairs identified the specific make and model of the equipment that was to be installed. (Doc. 28-2, at Page ID 1547, 1549). Melohn's president, John Mayher ("Mayher"), initialed and signed the revised bid on July 18, 2014. (*Id.*); (Harvey Aff. ¶ 14). Melohn apparently never received a copy of the revised bid with Horner's signature. Horner was approved for the PowerSaver grant in the amount of $3,401.73 on July 23, 2014. Horner closed on his purchase of the property on July 29, 2014.

The Parties' Dispute

In response to a draw request that Melohn submitted in the fall of 2014, Harvey wrote a letter to Melohn identifying a number of deficiencies in its work on both the exterior and interior of the house and its failure to comply with the Bid on Repairs. Of particular relevance here, he noted that Melohn needed to provide proof that the hot water tank and HVAC unit were Energy Star compliant. (Doc. 20-11, at PageID 589). Thereafter, Melohn filed an affidavit and amended affidavit of mechanics' lien, claiming to be owed $59, 213.76 on the project. (Doc. 20-9, at PageID 1127).

---

[1] The original Bid on Repairs did not include the installation of an EnergyStar compliant hot water tank or heating system because Horner did not originally seek a PowerSaver grant. (Harvey Aff. ¶ 7).

3

AmeriFirst became involved in the dispute on January 5, 2015, when Horner complained to AmeriFirst that final inspections of Melohn's work had not taken place. Rebecca Cepluch, AmeriFirst's Renovations Operations Specialist who was assigned to the Horner loan, wrote to Melohn the same day, explaining that AmeriFirst could not authorize payment until it had removed the mechanic's lien for the money that it had already been paid. In addition, she pointed out that the contractors it had used for the HVAC and plumbing were unaware of the type of equipment that was to be installed. (Doc. 20-15, at PageID 600).

Melohn then initiated an arbitration proceeding against Horner. As a result of settlement negotiations during the proceeding, Melohn and Horner entered into a Settlement Agreement and Release on February 22, 2015 ("Settlement Agreement"). The Settlement Agreement acknowledged that Melohn's work was "subject to the specifications, inspection requirements, and scope of repairs as detailed as part of Horner's ...HUD 203(K) loan between Horner and AmeriFirst." It required the parties to jointly engage Fred Freer of Four Square Restorations, Inc. to inspect and determine the scope of work properly performed by Melohn. Freer was to have the sole discretion to determine the percentage of work that Melohn had completed based on the evidence that the parties submitted to him and his inspection. The Settlement Agreement provided that Horner would submit a brief and exhibits to Freer by March 4, 2015, and that Melohn would submit its brief and materials by March 15, 2015. After reviewing the parties' submission, Freer was to do a site inspection and then issue his report. The parties agreed that his report would be "final and binding on both parties as to percent complete on the Project and the resulting payment, if any, owed to Melohn or Horner." Based on his report, Freer was to draft a final draw request "in substantially the same form required by Horner's HUD 203(K) loan."

AmeriFirst was to be "afforded a reasonable time to review the Final Report and issue payment from the Project Escrow." The Agreement provided that "[s]hould AmeriFirst refuse or otherwise reject some or all of the payment requested in the Final Report, Horner shall pay to Melohn by check the difference between the amount approved by AmeriFirst and the amount detailed in the Final Report." (Doc. 20-16, at PageID 604-607). Finally, the parties agreed that "any claims or causes of action related to" the Settlement Agreement were to be brought in the Cuyahoga County Court of Common Pleas.

On April 20, 2015, Freer sent an email entitled "Final Report" to Rebecca Cepluch of AmeriFirst, Horner, Mayher, and Melohn's legal representative. In the report, Freer determined that there were outstanding issues with both the plumbing and heating. However, the report states that the Specification of Repairs on which he based his analysis did not identify a specific make or model of water heater and HVAC system that were to be installed, and he did not address whether the equipment that Melohn had installed was Energy Star compliant. He deemed the plumbing work to be 65% complete and the heating work to be 45% complete. In total, he found that Melohn was owed $25,607.46 for his work on the project.

Shortly after receiving the report, Cepluch responded: "This is unacceptable. We have mentioned multiple times and it was in some of the correspondence–and I can provide this accordingly. Please see attached and amend/correct appropriately." (Doc. 20-18, at Page ID 619). She attached a copy of a Work Write-Up dated December 4, 2014, which was several weeks after Melohn had stopped work on the project. Despite the date, the Work Write-Up was consistent with the July 18, 2014 Contractor's Bid on Repairs that required installation of an Energy Star-compliant hot water tank and heating system. (Lewers Aff. ¶ 12). Shortly thereafter,

5

Cepluch sent another email to Freer:

> Thank you. I was not totally clear but my reason for sending along the original signed final WWU and the original signed final bid was to point out–water heater and furnace were not installed to specifications and cannot be paid out accordingly. In addition, there should be an allowance for removal of the installed systems and this will certainly be a charge incurred to replace with the correct equipment. Last, the photographs attached show the equipment currently installed as inspected previously by Steve Harvey.[2]

(*Id.*). Freer then sent an email to Mahyer asking him "[o]n or about what date did your firm install the furnace and air conditioning condensing units and what was your instruction to do so?" (*Id.* at PageID 615). Mahyer did not respond.

Later in the afternoon, Freer sent a revised report. The report states that he made revisions "to reflect information received following my issuance of the initial report. Specifically, I was provided with a copy of the HUD 203K work write-up dated 12/04/2015 that contains specific notations in sections #27 (Plumbing) and #29 (Heating) that materially affect these two work categories." In the plumbing section of the revised report, Freer noted that the "SOR required a specific water heater. The water heater installed does not comport with the specification and is not Energy Star qualified." He determined that the plumbing work was only 35% complete. In the heating portion of his report, Freer determined that Melohn had installed a heater that did not comply with the requirements of the SOR and determined that the heating work was only 15% complete. (Doc. 20-19, at PageID 628-630). Taking into account the revisions to his original report, Freer determined that Melohn was owed $13,234.26 for his work on the project.

---

[2] Although Cepluch states in her email that she sent "the original signed final bid" to Freer, the record is not clear as to which bid she was referring to.

6

On July 14, 2015, Freer sued Melohn in the Shaker Heights Municipal Court, seeking payment for his work performed in conjunction with the Settlement Agreement. On September 29, 2015, the court issued its opinion in favor of Melohn. It found that Freer had materially breached his agreement with Melohn and Horner by amending his report in light of the documents that AmeriFirst sent. The court reasoned that these documents were sent outside the parameters of the Settlement Agreement, which called for only Horner and Melohn to submit materials to Freer by a certain date. The court also concluded that Freer breached the agreement by failing to submit a final draw request to AmeriFirst.

Meanwhile, Melohn reinitiated arbitration proceedings against Horner. In the arbitration, Melohn claimed that it should be compensated for its work performed on the project, including recovery of overhead and lost profit on the remainder of the project. Horner filed a counterclaim, alleging that Melohn's work was defective and incomplete and that the cost of correcting Melohn's work exceeded the fair value of the work. On March 4, 2016, the arbitrator issued his Final Arbitration Award, concluding that Melohn had performed work on the project and was entitled to some recovery but that it had breached its agreement with Horner in a number of ways, including by failing to perform work in a workmanlike manner or in accordance with the requirements of the parties' agreement. As relevant here, the Arbitrator found that the plumbing and HVAC system were not performed in a workmanlike manner and did not comply with the requirements of the agreement because non-Energy Star systems were installed.(Doc. 20-25, at 8-9). In determining the amount that Horner owed Melohn, the arbitrator calculated the percentage completion of each category of work and then deducted the loss of the Energy Star Credit. Ultimately, he concluded that Horner owed Melohn $25,598.07. Melohn did not seek to

7

modify or vacate the arbitrator's award.

Two weeks later, on March 18, 2016, Melohn filed suit in the Cuyahoga County Court of Common Pleas against AmeriFirst, alleging that Cepluch tortiously interfered with the Settlement Agreement by requesting that Freer revise his report. Before a ruling on AmeriFirst's motion for summary judgment, Melohn voluntarily dismissed the action.

On May 23, 2017, Melohn again filed suit against AmeriFirst in the Cuyahoga County Court of Common Pleas, alleging that AmeriFirst, through Cepluch, tortiously interfered with the Settlement Agreement as well as the March 2, 2015 Letter of Engagement between Freer, Horner, and Melohn. Melohn also brought a separate claim for punitive damages. AmeriFirst timely removed the case to this Court. AmeriFirst now moves for summary judgment on both of Melohn's claims. Melohn opposes AmeriFirst's motion and cross-moves for summary judgment on its tortious interference claim.

**SUMMARY JUDGMENT STANDARD**

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed .R.Civ.P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary

judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remain unchanged" and the amendment "will not affect continuing development of the decisional law construing and applying" the standard. *See* Fed.R.Civ.P. 56, Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985). However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a

jury." *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

## **LAW AND ANALYSIS**

### **A. Tortious interference**

In Count I, Melohn alleges that AmeriFirst, through Rebecca Cepluch, tortiously interfered with the Settlement Agreement between Melohn and Horner and the Letter of Engagement between Melohn, Horner, and Freer. Specifically, it maintains that Cepluch's communications with Freer on April 20, 2015, constitute tortious interference. The parties cross-move for summary judgment on the claim. Because the Court concludes that there is no genuine issue of material fact as to whether AmeriFirst was permitted to notify Freer that his initial report was erroneous, AmeriFirst is entitled to summary judgment on Count I.

Tortious interference with a contract occurs when a person, without privilege to do so, causes a third party not to perform a contract with another. *A & B-Abell Elevator v. Columbus/Cent. Ohio Bldg.*, 73 Ohio St. 3d 1, 14, 651 N.E.2d 1283, 1294 (1995). A party must meet five elements to establish a claim of tortious interference: (1) a contract; (2) the

10

wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional and improper action taken to procure a contractual breach; (4) a lack of privilege; and (5) resulting damages. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 176, 707 N.E.2d 853, 858 (1999).

With respect to the fourth element, only improper interference with a contract is actionable. Thus, even if an actor's interference with another's contract causes the plaintiff to suffer damages, that interference does not constitute a tort if the interference is justified. *Id*. The Ohio Supreme Court has adopted Section 767 of the Restatement (Second) of Torts for use in determining whether an actor's interference is improper. Section 767 sets forth the following seven factors that a court should consider:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Id.* at 178-79, 707 N.E.2d at 860. Ohio law places the burden of proving "lack of privilege" or "improper justification" on the plaintiff. *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 742 (6th Cir. 1999).

### 1. AmeriFirst's conduct

The first factor, nature of the actor's conduct, is the primary factor that a court must consider. *Id.* This factor weighs in favor of AmeriFirst. AmeriFirst did "nothing that was independently criminal, tortious, or even wrongful" in informing Freer that his report was inaccurate because it did not account for the fact that Horner's PowerSaver loan required Energy Star appliances. *See Havensure, L.L.C. v. Prudential Ins. Co. of Am.*, 595 F.3d 312, 316–17 (6th

Cir. 2010). Nor is there any evidence that AmeriFirst committed fraud or misrepresentation. *Id.* Rather, AmeriFirst and Harvey were both clear and consistent in informing Melohn that its work needed to conform to the terms of the PowerSaver grant. AmeriFirst informed Melohn on July 16, 2014, that Horner intended to seek the grant and that the grant required Energy Star-compliant systems. It also provided Melohn with a copy of the grant's eligibility checklist. Two days later, Mayher initialed and signed the revised Bid on Repairs, which specified the make and model of the Energy Star products that Melohn was to install. In November of 2014, Harvey informed Melohn that it needed to provide proof that the hot water tank and HVAC unit were Energy Star compliant. In January of 2015, Cepluch again informed Melohn that there were issues with the HVAC and plumbing because the subcontractors that Melohn had used were unaware of the type of equipment that was to be installed. Cepluch's emails to Freer on April 20, 2015, were consistent with the reminders that AmeriFirst had been sending Melohn all along: its contract with Horner required it to install Energy Star-compliant HVAC and plumbing equipment.

Mayher avers that he "was not timely advised of the change to an 'Energy Star' furnace and hot water heater, and thus had installed non-'Energy Star' units under the original July specifications." (Affidavit of John T. Mahyer, at ¶ 9). This assertion is blatantly contradicted by the record.[3] As just noted, the record demonstrates that Melohn and Mahyer were aware no later

---

[3] *See Coble v. City of White House, Tenn.*, 634 F.3d 865, 868 (6th Cir. 2011) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") (quoting *Scott v. Harris*, 550 U.S. 372, 379–81, 127 S.Ct. 1769) (2009)) .

12

than July 16, 2014–nearly two weeks before Horner even closed on the property–that Horner was pursuing a PowerSaver grant, which required the installation of Energy Star equipment. Indeed, Mahyer initialed and signed documents specifying that Melohn would install such equipment. Moreover, the assertion is belied by Melohn's failure to object to any of AmeriFirst's reminders that Melohn had agreed to install Energy Star-compliant systems as well as its failure to challenge the arbitrator's conclusion that it was required to install Energy Star equipment. Thus, Mahyer's claim that he was unaware of the requirement until it was too late, which is inconsistent with all of the evidence, is insufficient to cast AmeriFirst's conduct in a negative light.

Melohn also contends that there was never an agreement between it and Horner for the installation of Energy Star equipment because Horner never executed a valid change order. A meeting of the minds as to the essential terms of the contract is a requirement to enforcing a contract. *Kostelnik v. Helper,* 96 Ohio St.3d 1, 770 N.E.2d 58 (2002). A meeting of the minds occurs if "a reasonable person would find that the parties manifested a present intention to be bound to an agreement." *Zelina v. Hillyer,* 165 Ohio App.3d 255, 846 N.E.2d 68 (Ohio 9th Dist. 2005). Unless there is "clear evidence" that the parties "did not intend to be bound by the terms of an agreement until formalized in a written document and signed by both," Ohio courts have held that it is not necessary for both parties to sign the agreement for it to be enforceable. *See Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.*, 54 Ohio St. 2d 147, 151 (1978) (noting that "[s]ignature spaces in the form contract do not in and of themselves require that the signatures of the parties are a condition precedent to the agreement's enforceability"); *see also American States Ins. Co. v. Honeywell, Inc.*, 1990 WL 19319 (Ohio 8th Dist. March 1, 1990) (quotations

13

omitted) ("If either party to the contract has otherwise signed a sufficient memorandum, it is enforceable against him as the party to be charged, even though no memorandum has been signed by the other party for whose benefit it is being enforced."). Here, although Harvey indicated that he "believe[d] [that] both [Horner and Melohn] need[ed] to initial each page and sign the last page" of the July 18, 2014 Bid on Repairs, nothing in the bid stated that it was only effective if both parties signed it. Moreover, the email exchanges between the parties make it clear that Melohn knew that Horner was seeking a PowerSaver grant, which required the installation of Energy Star-compliant systems. By initialing and signing the revised bid, Melohn indicated its intent to be bound by the agreement, even if it never received a signed copy from Horner.

Melohn also suggests that AmeriFirst's conduct was wrongful because it knew that it was "interjecting itself in a contractually-detailed dispute resolution process that made no provision for AmeriFirst to participate in either the determination or the amount owed or the correctness of the findings. It is beyond dispute that AmeriFirst acted contrary to R.C. 2711.11 and the Arbitration Act when it solicited Freer to modify his award." (Doc. 24, at 29). Putting aside whether the Arbitration Act even applies to the Settlement Agreement, AmeriFirst did nothing wrong in notifying Freer that his report failed to account for the fact that Melohn was required to install Energy Star equipment. When Cepluch received Freer's report, she recognized that the report did not take into account that Melohn had not installed Energy Star equipment, as required by its agreement with Horner. Her emails served as notification to Freer, Melohn, and Horner as to why AmeriFirst found Freer's report objectionable and why AmeriFirst would, therefore, not pay the amount originally specified in Freer's report. The Settlement Agreement expressly

14

provided that AmeriFirst could "refuse or otherwise reject some or all of the payment requested in [Freer's] Final Report"–nothing in the Agreement prohibited AmeriFirst from stating the reason for its refusal to pay. Thus, Cepluch's explanation as to the errors in Freer's report does not demonstrate that AmeriFirst's conduct was wrongful.

2. AmeriFirst's interest

AmeriFirst's interest also weighs strongly in favor of AmeriFirst. Ohio courts have recognized that "one is privileged to purposely cause another not to perform a contract with a third person where the defendant, in good faith, is asserting a legally protected interest of his own which he believes will be impaired or destroyed by the performance of the contract." *Bridge v. Park Nat'l Bank*, 179 Ohio App.3d 761, 768 (2008). Melohn contends that AmeriFirst had no legally protected interest of its own that would be impaired or destroyed by the performance of the contract. Because "[o]nly Horner's money was at stake," Melohn believes that AmeriFirst had no reason or right to object to the findings in Freer's report. Melohn's argument is not well-taken. As an approved FHA lender for HUD 203K loans, HUD routinely audits AmeriFirst's files for compliance with HUD and FHA guidelines. (Brad Lewers Aff. ¶ 16). Horner's Rehabilitation Loan Agreement specified that all improvements were to be made "in accordance with all applicable statutes and regulations." AmeriFirst, therefore, had a legitimate business interest–indeed, an obligation–to ensure that Horner's loan was being administered in accordance with HUD guidelines and to identify when it was not. (Lewers Aff. ¶17).

3. AmeriFirst's motive

AmeriFirst's motives in identifying the inaccuracies in Freer's report were legitimate. Its interference was limited to its legitimate business interest. Cepluch's email only pointed out the

15

issues regarding the non-compliant hot water heater and HVAC system, and to the extent that she asked Freer to revise his report, she did so only with respect to these issues. She did not demand that Horner terminate its agreement with Melohn or Freer or that Horner refuse to pay any money to Melohn. Additionally, as Melohn acknowledges, AmeriFirst received no financial advantage from identifying the errors in Freer's report because the Settlement Agreement provided that AmeriFirst could "refuse or otherwise reject some or all of the payment requested" in Freer's report and that Horner would be responsible for the difference.

Melohn suggests that AmeriFirst's motive in protecting Horner's interests was somehow improper. As support, it cites an email that Cepluch sent to Horner on April 23, 2015, after Freer sent his revised report to the parties:

> I hope you are pleased with the outcome. I had to take the wrath of John [Mayher] yesterday as because I was the one (once again) that caught the invalid line items being presented for payment–he and his lawyer ask [*sic*] me for all correspondence, emails, conversation logs etc. that I had with Fred. I had one conversation with him and that was Monday–to point to the obvious errors in the findings. It was only a difference of 12k! In fact at some point in one of the multiple emails amongst us all–it appeared that John was trying to assert he was unaware of the equipment specs and that the specs were changed after installation of the equipment. Don't know for sure–but that is sure what Fred's response looked like. Oh well–my job is to keep you and AF safe. Hopefully now you will have your renovated home in a few short weeks.

(Doc. 24-15). According to Melohn, this email shows that AmeriFirst's motive was improper because Cepluch was "working to reduce Melohn's recovery in the Freer arbitration process."[4]

---

[4] Melohn also contends that Cepluch's email supports its contentions that Melohn was not advised of a specification change to Energy Star equipment. It claims that the email shows that Cepluch did not "know for sure" if "the specs were changed after installation of the equipment" or not. (Doc. 24, at 22). That is not what the email says. Rather, Cepluch was simply informing Horner that, from her review of the email exchanges between Mayher and Freer, it "appeared" to her as if Mayher was trying to claim to Freer that he was unaware of the equipment

16

Melohn cites no support for its argument that there is anything inherently improper in a lender protecting the interests of its lendee, particularly when its interests are aligned with the lendee's. Moreover, Cepluch's email confirms that her motivation was not to reduce Melohn's recovery, but rather to identify "the invalid line items being presented for payment ...[and] to point to the obvious errors in the findings."

    4. <u>Melohn's interest</u>

Melohn has an interest in the terms of the Settlement Agreement being carried out. This factor, however, does not weigh heavily in its favor because, in effect, Melohn is attempting to benefit from an error in Freer's original report. For whatever reason–the record is not clear why–apparently neither Melohn nor Horner provided Freer with a copy of the specifications that identified the make and model of the water heater and HVAC system that Melohn was to install. As a result, Freer's original report was based on his mistaken understanding that Melohn was not required to install Energy Star equipment in the property. Still, Melohn believes Horner should pay the difference between the amount that Freer determined was due based on this mistaken understanding and what AmeriFirst agreed to pay. According to Melohn, "[w]hether or not Freer's findings were correct or comport with HUD §203k is irrelevant." (Doc. 24, at 28).

    5. <u>Remaining factors</u>

"The fifth factor, the social importance of contracts, is beyond dispute." *Super Silky*, 174 F.3d at 743. As discussed above, however, AmeriFirst's motive was not to harm Melohn but to

---

    specifications and that they were changed after he had installed the equipment. She did not "know for sure" that her interpretation of the exchange was accurate, but Mayher's response to Freer "sure...looked like" that was what he was trying to do.

protect its own legitimate business interests. *See id.* Moreover, AmeriFirst's actions had the effect of protecting the original agreement between Horner and Melohn, and as such, did not undermine the social importance of contracts.

The sixth factor looks to the proximity of the conduct in causing the harm. Even assuming that Cepluch's email caused Freer to revise his report, this factor is insufficient to render AmeriFirst's interference improper.

The final factor, the relations between the parties, weighs in favor of AmeriFirst. The relationship between AmeriFirst and Melohn was at arm's length and not fiduciary in nature. *See id.* Moreover, as noted above, there is no evidence of the type of conduct that has been found to be objectionable in other cases, such as fraud, misrepresentation, coercion, or threats. *Id.*

6. Conclusion

Weighing the factors, the evidence establishes that AmeriFirst acted in a permissible fashion with proper business motives. Thus, no rational jury could conclude, on the basis of these factors, that its actions were not privileged. AmeriFirst is, therefore, entitled to summary judgment on Melohn's tortious interference with a contract claim.

**B. Punitive damages**

Under Ohio law, "it is well-settled that 'punitive damages is not a separate claim in itself but rather an issue in the overall claim for damages.'" *Reid v. Plainsboro Partners, III*, 2010 WL 3610931, at *15 (Ohio 10 th Dist. Sep. 16, 2010). Having concluded that AmeriFirst is entitled to summary judgment on Melohn's only tort claim against it, the Court concludes that Melohn's claim for punitive damages fails as a matter of law. *See Watson v. Ford Motor Co.*, 2007 WL 4216975, at * 16 (Ohio 6th Dist. Nov. 30, 2007).

**CONCLUSION**

For the foregoing reasons, Defendant AmeriFirst Financial Corporation's Motion for Summary Judgment (Doc. 20) is GRANTED and Plaintiff The Melohn Companies, Inc.'s Motion for Partial Summary Judgment (Doc. 22) is DENIED. AmeriFirst's motion to file a sur-reply brief (Doc. 30) is GRANTED.

IT IS SO ORDERED.

                                             /s/ Patricia A. Gaughan
                                             PATRICIA A. GAUGHAN
                                             United States District Court
                                             Chief Judge

Dated: 4/26/18